**United States District Court**
For the Northern District of California

1
2
3
4
5               UNITED STATES DISTRICT COURT
6               NORTHERN DISTRICT OF CALIFORNIA
7
8   UNITED STATES OF AMERICA,                No. CR-12-0483 EMC
9           Plaintiff,                       **ORDER DENYING DEFENDANT'S**
                                             **REQUEST FOR A MISTRIAL; AND**
10          v.                               **DENYING DEFENDANT'S MOTION**
                                             **FOR ACQUITTAL OR FOR A NEW**
11  PETER WONG,                              **TRIAL**
12          Defendant.                       **(Docket Nos. 257, 258)**
    _____/
13
14              **I.    INTRODUCTION**
15          Pending before the Court is Defendant's renewed motion for judgment of acquittal pursuant
16  to Federal Rule of Criminal Procedure 29 and motion for a new trial pursuant to Federal Rule of
17  Criminal Procedure 33.  Docket No. 257, 258.  In November 2013, Defendant stood trial on five
18  counts of theft concerning a federally funded program, one count of conspiracy to commit theft from
19  a federally funded program, one count of mail fraud, and one count of aggravated identity theft.
20  Defendant was convicted on three counts of theft concerning a federally funded program and
21  acquitted on all remaining counts.  Defendant seeks a judgment of acquittal arguing that the
22  government failed to produce sufficient evidence at trial that Defendant had the intent to steal the
23  negotiable instruments underlying the three counts on which he was convicted.  He further moves
24  for a new trial alleging that the verdict is contrary to the weight of evidence, that he was prejudiced
25  by the government's summary witness, that the Court erroneously declined to give a mistake of fact
26  instruction, and that the Court erroneously denied Defendant's motion to suppress.
27          Finally, Defendant has moved for a mistrial on the basis of a letter the Court received from a
28  juror in this action, stating that another juror spoke of personal experiences in the banking industry.

Defendant argues this letter reveals that prejudicial extraneous information was introduced to the jury.

For the following reasons, Defendant's motion is **DENIED**.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

The indictment in this case was filed on June 21, 2012.  Docket No. 1.  A second superseding indictment ("SSI") was filed on May 2, 2013 (Docket No. 89) and alleged the following facts:

Defendant Peter Wong is a former deputy public administrator with the County of San Mateo.  SSI § 2.  The public administrator is charged with investigating and administering the estates of San Mateo County residents who died without a will or an individual willing and able to act as estate administrator.  *Id.* ¶ 3.  As a deputy public administrator, Defendant was charged with protecting the decedent's property from waste, loss, or theft; making burial arrangements; conducting investigations to discover the decedent's assets; liquidating assets by either selling them or distributing them to heirs; paying bills and taxes; and locating heirs.  *Id.* ¶ 4.

The indictment charged Defendant[1] with five counts of theft concerning a federally funded program in violation of 18 U.S.C. § 666(a)(1)(A), one count of conspiracy to commit theft concerning a federally funded program in violation of 18 U.S.C. § 371, one count of mail fraud in violation of 18 U.S.C. § 1341, and one count of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1).  Following a jury verdict, Defendant was acquitted on two counts of theft from a federally funded program as well as the conspiracy, mail fraud, and aggravated identify theft counts.  Docket No. 234.  Defendant was convicted on three counts of theft concerning a federally funded program.  *Id.*  The three counts on which Defendant was convicted relate to three separate negotiable instruments that were located in Defendant's home during the execution of a search warrant after Defendant had left the employ of San Mateo County.  Specifically, Count Three involved a $5,613.00 cashier's check which represented the proceeds of the sale of jewelry from the estate of Rickey Bates.  *Id.* ¶ 13.  Count Four involved a $206,412.78 cashier's check representing the

---

[1] The indictment also charged Defendant's fellow former deputy public administrator, Mandy Yagi.  Ms. Yagi was acquitted of all charges following a trial by jury.  Docket No. 234.

United States District Court
For the Northern District of California

proceeds of certificates of deposit belonging to the estate of Dwight Lovell.  *Id.*  Finally, Count six

involved a $10,000 savings bond from the estate of Dwight Lovell.  *Id.*

Additional facts, and a discussion of the evidence produced at trial, are included below as

necessary to address the arguments raised by Defendant.

### III.    DEFENDANT'S REQUEST FOR A MISTRIAL

On December 5, 2013, the Court received a letter from a juror in this case regarding the

jury's deliberations.  Docket No. 241-1.  In relevant part, this letter stated:

> Concerning count 6, the jurors were split about not only Mr. Wong's
> intent, but whether he would have, or could have, cashed the financial
> instruments in his possession or not.  One member of the jury who was
> experienced in the procedures of the banking industry, the cashing of
> cashier's checks, bonds and the use of medallions (a somewhat more
> difficult process), told us that those financial instruments could have
> been cashed by Mr. Wong.

*Id.*  The Court ordered the parties to file cross-briefs regarding whether an evidentiary hearing on

this matter was necessary and to address the applicability and effect of Federal Rule of Evidence

606(b).  Docket No. 241.  In his brief, Defendant argues that it is apparent from this letter that the

referenced juror exposed the jury to prejudicial, extraneous information.  Docket No. 247.

Specifically, he argues that the juror's statements were both inaccurate and went beyond the

testimony proffered at trial.  *Id.* at 5.  Because the Court concludes that inquiry into this matter is

precluded under Federal Rule of Evidence 606(b) and finds no juror misconduct or prejudicial

extraneous information was presented to the jury, the Court declines to hold an evidentiary hearing

on this matter and **DENIES** Defendant's request for a mistrial.

Rule 606(b)(1) provides that "[d]uring an inquiry into the validity of a verdict . . . a juror

may not testify about any statement made or incident that occurred during the jury's deliberations;

the effect of anything on that juror's or another juror's vote; or any juror's mental processes

concerning the verdict or indictment.  The Court may not receive a juror's affidavit or evidence of a

juror's statement on these matters."  Fed. R. Evid. 606(b)(1).  This rule protects jury deliberations

because "full and frank discussion in the jury room, jurors' willingness to return an unpopular

verdict, and the community's trust in a system that relies on the decisions of laypeople would all be

undermined by a barrage of postverdict scrutiny of juror conduct."  *Tanner v. United States*, 483

**United States District Court**

For the Northern District of California

U.S. 107, 120-21 (1987).  There are, however, two exceptions to Rule 606(b)(1)'s categorical prohibition on post-verdict inquiry into a jury's deliberations.  "[A] juror may testify as to whether (1) 'extraneous prejudicial information was improperly brought to the jury's attention' or (2) whether 'any outside influence was improperly brought to bear upon any juror.'"  *United States v. Rutherford*, 371 F.3d 634, 640 (9th Cir. 2004) (quoting Fed. R. Evid. 606(b)(2)).

Accordingly, the Court must determine whether a juror "experienced in the procedures of the banking industry," exposes a jury to "extraneous prejudicial information" by discussing this experience.  The Court concludes it does not.  "It is well established that 'a juror's past personal experiences may be an appropriate part of the jury's deliberations.'"  *United States v. Budziak*, 697 F.3d 1105, 1111 (9th Cir. 2012) (quoting *Grotemeyer v. Hickman*, 393 F.3d 871, 879 (9th Cir. 2004)); *see also Hard v. Nurlington Northern R.R. Co.*, 870 F.2d 1454, 1462 (9th Cir. 1989) ("It is expected that jurors will bring their life experiences to bear on the facts of a case.").  In *Budziak*, two jurors in a child pornography case notified defense counsel that "several of the more 'computer savvy' jurors speculated that Budziak may have reinstalled his LimeWire program, which they suggested could explain the lack of forensic evidence of distribution of child pornography in June 2007."  *Budziak*, 697 F.3d at 1111.  The district court rejected the defendant's motion for a new trial and for an evidentiary hearing.  The Ninth Circuit affirmed, finding that the district court "correctly determined that the alleged juror conduct was not a legitimate subject of inquiry under the Federal Rules of Evidence."  *Id.*

Similarly, in *Grotemeyer v. Hickman*, 393 F.3d 871 (9th Cir. 2004), the Ninth Circuit on habeas review held that a juror's statements to her fellow jurors regarding the medical evidence did not violate any constitutional jury rights.  In the underlying criminal proceeding, the juror – a medical doctor – stated that (1) based on her medical experience, defendant was "either mentally ill or retarded, and that this condition caused [the defendant] to commit the crime for which he was charged"; (2) that the juror had  had "been through this before" and that the defendant was "indeed guilty of the charges"; and (3) that if defendant was convicted he would receive "adequate mental health care" as part of his sentence.  *Id.* at 875.  The court rejected the argument that the juror's statements violated the right to an impartial jury or the right to confront witnesses:

United States District Court
For the Northern District of California

> The mere fact that the jury foreman brought her outside experience to bear on the case is not sufficient to make her alleged statements violate Grotemeyer's constitutional right to confrontation. Counsel ordinarily learn during voir dire what a veniremember does for a living, and use peremptory challenges to void jurors whose experiences would give them excessive influence.  Dr. Papadakis's experience was not shared by the entire jury . . . but there is nothing wrong with her using it. . . .
>
> . . . . That a physician is on the jury does not deprive a defendant of his constitutional right to an impartial jury, even though the physician will doubtless have knowledge and experience bearing on any medical questions that may arise.

*Id.* at 878-79.  Finally, the court noted that it is the personal experiences of the jurors which make them, as opposed to a judge, better able to evaluate the credibility and determine the weight to be given to testimony or evidence.  *See id.* at 879 ("It is hard to know who is lying without some understanding, based on past personal experience, of the circumstances of the witnesses."); *see also id.* at 880 ("Were we to require the impossible and prohibit jurors from relying on relevant, past personal experience, about all we would accomplish would be to induce jurors to lie about it when questioned afterward, unless we limited jury participation to the most unworldly and ignorant individuals.").

Additionally, in *Marquez v. City of Albuquerque*, 399 F.3d 1216 (10th Cir. 2005), a plaintiff brought a claim under 42 U.S.C. § 1983 alleging that police employed excessive force when they used a police dog to effectuate an arrest.  During deliberations, a juror sent a note to the judge stating that one juror was "holding herself out as an expert in police dog training" and

> made three assertions during deliberations: (1) Police dogs do not bite unless the suspect is fleeing; (2) The injuries suffered by Marquez from the bite were not serious; and (3) Police dogs do not bite the first part of the body they come across.

*Id.* at 1223.  The court denied the plaintiff's motion for an evidentiary hearing under Rule 606(b) to determine if extraneous information was improperly influencing the jury.  The Tenth Circuit affirmed, finding that the "alleged 'extraneous prejudicial information' was the juror's personal experience with training police dogs.  A juror's personal experience, however, does not constitute 'extraneous prejudicial information.'"  *Id.* (quoting 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 606.03(1)(b) (2d ed. 2004)).  Accordingly, because Rule 606(b)

5

United States District Court

For the Northern District of California

1  would have prevented any juror from testifying as to the statements, the court found that an

2  evidentiary hearing would have been futile.  *Id.*

3          Here, the Court finds that the juror's letter does not indicate that extraneous information was

4  presented to the jury by one of the jurors.  The government presented witness testimony suggesting

5  that there are ways to cash both savings bonds as well as cashier's checks made out in a similar way

6  (*i.e.*, to the estate of the decedent) to the checks involved in this case.  Defendant argues that the

7  juror's comments generally went beyond the scope of the testimony of the government's witnesses.

8  However, this does not render the juror's statements extraneous information for purposes of Rule

9  606(b).  The Defendant's ability to cash the negotiable instruments in this case was at issue in trial

10  and both sides introduced evidence and testimony on this point.  For example, the government

11  introduced two witnesses (Mr. Daly and Mr. Farris) who testified as to methods by which someone

12  in Defendant's position could have cashed the cashier's checks at issue.  By contrast, Defendant

13  testified that he believed, and was told by a bank teller, that the cashier's checks would be

14  "irrevocable" if made out with the estate being both the remitter and payee.  As evidence on this

15  issue was introduced at trial, a juror's use of personal experience in the banking industry to consider

16  and evaluate the evidence was proper.[2]

17          Of course, jurors' use of personal experience is subject to limitations.  As Defendant has

18  noted, courts have recognized that a juror's opinion based on "specialized information obtained from

19  outside sources" is problematic.  *Coleman v. Sisto*, No. 2:09-cv-0020 DAD, 2012 WL 6020095, at

20  *5 (E.D. Cal. Dec. 3, 2012) (examining California state cases).  Stated another way, a juror's

21  personal experience "constitutes extraneous evidence what may be used to impeach the verdict

22  where: (1) a juror has personal knowledge of the parties or issues in the litigation, or (2) a juror uses

23  past experience regarding a fact on which no evidence has been submitted."  *Hawkins v. Wong*, No.

24  CIV S-96-1155 MCE EFB DP, 2010 WL 3516399, at *37 (E.D. Cal. Sept. 2, 2010).

25

26          [2] The Court notes that "[c]ounsel ordinarily learn during voir dire what a veniremember does
27  for a living, and use peremptory challenges to avoid jurors whose experience would give them
    excessive influence."  *Grotemeyer*, 393 F.3d at 878.  Here, the parties were not only informed about
    what the veniremembers did for a living, they had an opportunity to conduct their own voir dire of
28  the veniremembers beyond the Court's traditional questions.

However, these exceptions appear narrow in application.  An example of the first category of "extrinsic evidence" is *Hard v. Burlington Northern R.R.*, 812 F.2d 482 (9th Cir. 1987).  There, Burlington Northern was a defendant in a personal injury action involving an employee.  One juror was a former employee of Burlington Northern.  During deliberations, this juror spoke of Burlington Northern's settlement practices, including its payment of injured employees' medical expenses.  *Id.* at 485.  The Court found that "[j]urors must rely on their past personal experiences when hearing a trial and deliberating on a verdict.  Where, however, those experiences are related to the litigation . . . they constitute extraneous evidence which may be used to impeach the jury's verdict."  *Id.* at 486.  Thus, because the juror had personal knowledge about the specific parties at issue in that case, the juror's discussion of this personal knowledge represented extraneous information.  *See Mancuso v. Olivarez*, 292 F.3d 939, 951 (9th Cir. 2002) ("A juror's personal knowledge of *specific information* concerning the defendant or the defendant's alleged crime constitutes impermissible extrinsic evidence.") (emphasis added).

The second category of "extraneous information" is seen in *United States v. Navarro-Garcia*, 926 F.2d 818 (9th Cir. 1991).  There, Defendant was convicted of importing marijuana by placing 344 pounds of marijuana in the trunk of her car and driving it across the border.  The defendant argued that she did not know about the drugs in the trunk.  *Id.* at 820.  No evidence was introduced at trial on the question of how 350 pounds of marijuana would affect the performance or handling of a car.  *Id.* at 822.  A juror, however, conducted an experiment by placing approximately 300 pounds in the trunk of her car and driving around and then reported her findings to the other jury members.  *Id.*  The Ninth Circuit stated that such an experiment "clearly constitutes extrinsic evidence."  *Id.*  Accordingly, it held the district court should have held an evidentiary hearing to determine the effect of this extrinsic evidence on the verdict.  The court emphasized that "no evidence was presented at trial regarding the effect on the operation of her car of the added weight of the marijuana in the trunk."  *Id.* at 823; *see also Mancuso*, 292 F.3d at 951 (finding a juror's use of prior experience as a youth counselor for the  California Department of Corrections constituted extraneous information because the juror was able to determine, based on looking at booking numbers in photos, that the

petitioner had a longer criminal history that his co-defendant – an issue the court had expressly excluded from being introduced at trial).

In this case, the letter the Court received demonstrates that the juror's use of personal experience was not improper or extraneous.  The jurors did not acquire evidence specific to the defendant and this case.  Rather, the juror generally used his experience in the banking industry to evaluate the weight and credibility of the evidence and testimony.  Because the juror's letter in this case does not indicate that the jury was subject to extraneous information, the Court is barred by Rule 606(b) from inquiring into the other juror's statements regarding his experience in the banking industry.  Accordingly, the Court **DENIES** Defendant's request for an evidentiary hearing and for a mistrial.

## IV.   DEFENDANT'S MOTION FOR
## RENEWED JUDGMENT OF ACQUITTAL

A.   Legal Standard

Under Federal Rule of Criminal Procedure 29, a defendant may file a motion for a judgment of acquittal after a jury verdict. A Rule 29 motion is basically a challenge to the sufficiency of evidence. "In ruling on a Rule 29 motion, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir.2002) (quoting *United States v. Bahena-Cardenas*, 70 F.3d 1071, 1072-73 (9th Cir. 1995)).  "[I]t is not the district court's function to determine witness credibility when ruling on a Rule 29 motion." *Id.*

B.   Application

Defendant argues that he is entitled to a judgment of acquittal because the government failed to introduce sufficient evidence at trial that he possessed the intent to steal, convert, embezzle, or knowingly convert the negotiable instruments underlying his convictions.

Intent or knowledge is rarely provable with direct evidence.  *United States v. Ned*, 637 F.3d 562 (5th Cir. 2011) (noting that knowledge and intent are "subjective elements" which can "rarely be proven by direct evidence"); *United States v. Boone*, 628 F.3d 927, 936 (7th Cir. 2010) (same);

United States District Court
For the Northern District of California

*United States v. Bank of New England, N.A.*, 821 F.2d 844, 854 (1st Cir. 1987) ("Willfulness can rarely be proven by direct evidence, since it is a state of mind; it is usually established by drawing reasonable inferences from the available facts.").  Accordingly, courts have routinely held that intent may be inferred from circumstantial evidence.  *See, e.g.*, *United States v. Santos*, 527 F.3d 1003, 1009 (9th Cir. 2008) ("The government is not required to produce direct evidence of the defendant's intent; rather, it may provide circumstantial evidence from which the district court can draw reasonable inferences."); *United States v. Agostino*, 132 F.3d 1183, 1192-93 (7th Cir. 1997) (finding that the timing of a challenged transaction was sufficient circumstantial evidence to show the "requisite corrupt intent to establish a violation of § 666(a)(2)").

Defendant argues that his testimony and corroborating evidence affirmatively demonstrates that he did not intend to steal the negotiable instruments underlying his conviction.  For example, he argues that during his testimony, he explained that at the time he received the instruments in question, he was unable to enter them into the "Panoramic" accounting system of the County and therefore placed them into protective "sleeves" in the estate file he maintained in his office.  He then testified the negotiable instruments ended up in his house when he took the estate file home to work remotely.  Wong Tr. at 101, 197-98, 203.  He then mistakenly believed that he had turned over the negotiable instruments to the County for deposit.  *Id.* at 400.  Defendant further points to the fact that there was no evidence at trial suggesting that he ever attempted to cash the instruments.  He further argues that his testimony is corroborated by: (1) the fact that the government introduced no evidence that Defendant actually could have cashed the Lovell cashier's check and (2) that the Panoramic records confirm that Defendant did not have the ability to deposit the cashier's check or savings bond into the Panoramic system when he received them.

The fundamental problem with Defendant's argument is that it is based on the premise that the jury should have believed his testimony.  There was substantial evidence which contradicted Defendant's theory:

- Notwithstanding the dispute over whether Defendant had access to the Panoramic system at certain periods of time, Defendant continued in possession of the three negotiable instruments underlying his conviction for months after it is undisputed he was able to access the Panoramic system. This includes the over one month period after Defendant resigned as a deputy

public administrator. Thus, even under the Defendant's theory, he had possession of the negotiable instruments beyond the time it was necessary and unquestionably beyond the time he was authorized to do so.

- There is no indication in the record that Defendant informed his superiors – or anyone else at the County – about the existence of the two cashier's checks or the savings bond at issue. Katherine Howard testified that as of November 2011[3] deputy public administrators had the power – and were expected – to immediately hand over estate checks to the budget accounting office and savings bonds to estate management. *See* Howard Tr. at 27-28.

- Additional estate property beyond the three negotiable instruments at issue were found in Defendant's house. This included additional savings bonds, hundreds of dollars in foreign currency, and a Rolex watch (along with two counterfeit Rolex watches).

- Inventory lists and inventory receipts from certain estate files, including items which were sold by Defendant, were found in Defendant's home. Evidence was introduced suggesting these inventory lists and receipts had been removed from the estate files, thereby removing any trace of the item. For example, Defendant sold an Omega Seasmaster watch belonging to the estate of Ian Malcolm. A copy of the inventory receipt was found in Defendant's home. The entry for the Seamaster watch was crossed off. Wong Tr. at 216, 416. Defendant claimed that he took the proceeds from this sale, cashed the check, and placed it in the safe. *Id.* at 405. Evidence and testimony at trial, however, suggests this cash was never located in the safe. *Id.* at 413; Ex. 288.

- Defendant's explanation for the presence of certain estate items in his house at times strained credulity. For example, Defendant testified that he took the one real and two counterfeit Rolex watches home in late July or early August with the intent to destroy them because he believed all of them to be fake. He stated he took them home to destroy them because he did not have a hammer at work. He further testified that he could not throw them in the garbage at the County offices because they were counterfeit and someone could have taken them. However, the watches were found on Defendant's dresser, in his bedroom, undestroyed, four months later. Similarly, when presented with a bag of apparently costume jewelry, Defendant began by stating that it may have come from an estate, that he could not recall precisely, and, when pressed, then stated he "probably picked them up somewhere from one of [his] friends." Wong Tr. at 363, 365.

- Evidence adduced at trial suggests that Defendant could have cashed the negotiable instruments at issue. For example, Mr. Daly testified that the Bates' estate check could have been canceled and the funds returned to the Defendant's account. Daly Tr. at 12. Mr. Farris and Ms. Howard testified as to ways Defendant could have deposited the Lovell estate check and the Lovell savings bond, respectively. Howard Tr. at 29.

---

[3] Ms. Howard started with the Public Administrator's Office in November 2011 and testified that she did not have personal knowledge as to procedures prior to that time.

United States District Court

For the Northern District of California

The jury was not required to believe Defendant's testimony over the contrary evidence put on by the government. *See United States v. Galvez-Guerrero*, 455 F. App'x 749, 752 (9th Cir. 2011) (affirming denial of Rule 29 motion because a jury "could have disbelieved entirely" the defendant's testimony). The evidence is capable of a competing inference the jury could rationally have drawn – that Defendant retained possession of the instruments (not only after he could have deposited them in Panoramic but also after he left his County position) not out of inadvertence, but rather because he intended to steal the cashier's check and savings bond.

To be sure, Defendant is correct: that the cashier's check represented funds that had already been in his personal account, that the cashier's checks were made out consistent with Defendant's prior practice and the County's policy, and that he never attempted to cash the instruments are all consistent with an innocent explanation. But these facts are also consistent with an individual who has taken the instruments with an intent to steal, wants to have plausible deniability should suspicions about the missing funds be raised, and therefore bides his time.

It is ultimately the responsibility of the jury to evaluate the evidence and to choose between competing inferences. *See United States v. Rojas*, 554 F.2d 938, 943 (9th Cir. 1977) ("In ruling on a Rule 29(c) motion, a district court must bear in mind that 'it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts.'" (quoting *United States v. Nelson*, 419 F.2d 1237, 1242 (9th Cir. 1969)). As a result, in evaluating Defendant's motion, the Court is required to view all conflicts in the light most favorable to the government and in upholding the jury's verdict. *See United States v. Duenas*, 691 F.3d 1070, 1084 n.8 (9th Cir. 2012) ("'[W]hen faced with a record of historical facts that supports conflicting inferences a reviewing court must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" (citation omitted). Accordingly, the Court is not permitted to construe the evidence in favor of Defendant's innocent explanations. *See United States v. Nevils*, 598 F.3d 1158, 1166 (9th Cir. 2010) (en banc) ("By construing the evidence in favor of an innocent explanation, and determining if such an explanation was equally or more reasonable than the government's incriminating explanation, *Bishop* misapplied

United States District Court

For the Northern District of California

1  the first step of *Jackson*, which limits the reviewing court to construing the evidence in the light

2  most favorable to the prosecution.").

3       In light of this highly deferential standard, Defendant's failure to deposit the negotiable

4  instruments in the County accounts, the failure of creating any record of the instruments, his failure

5  to notify any of his superiors about these instruments, and the presence of other estate assets in his

6  home all constitute circumstantial evidence from which a rational trier of fact could have inferred

7  Defendant's intent to steal the negotiable instruments.  Accordingly, Defendant's motion for a

8  judgment of acquittal pursuant to Federal Rule of Criminal procedure 29 is **DENIED**.

9                    **V.    DEFENDANT'S MOTION FOR NEW TRIAL**

10 A.   Legal Standard

11      Under Federal Rule of Criminal Procedure 33, a "court may vacate any judgment and grant a

12 new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "'A district court's power to

13 grant a motion for a new trial is much broader than its power to grant a motion for judgment of

14 acquittal . . . .'"  *United States v. Inzunza*, 638 F.3d 1006, 1026 (9th Cir. 2009) (quoting *United*

15 *States v. Alston*, 974 F.2d 1206, 1211-12 (9th Cir. 1992)).  Accordingly, a district court "'need not

16 view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so

17 doing evaluate for itself the credibility of the witnesses.'"  *United States v. Kellington*, 217 F.3d

18 1084, 1095 (9th Cir. 2000) (quoting *Alston*, 974 F.2d at 1211).

19      A new trial may be granted to correct erroneous jury instructions.  *See, e.g.*, *United States v.*

20 *Mann*, Cr. No. 11-1528, 2013 WL 6037681 (D.N.M. Nov. 7, 2013) ("A motion under Rule 33 may

21 be 'grounded on any reason other than newly discovered evidence,' including improper jury

22 instructions."); *United States v. Carter*, 966 F. Supp. 336, 340 (E.D.Pa. 1997) ("A Rule 33 motion

23 for a new trial is the more appropriate method for addressing the allegedly erroneous evidentiary

24 rulings and improper jury instructions.").  In determining whether instructions are misleading or

25 inadequate to guide the jury's deliberation, the Court evaluates the instructions as a whole.  *See*

26 *United States v. Chang Da Liu*, 538 F.3d 1078, 1088 (9th Cir. 2008); *see also United States v.*

27 *Turner*, 189 F.3d 712 (8th Cir. 1999) ("In so doing, we do not consider portions of a jury instruction

28

United States District Court

For the Northern District of California

1   in isolation, but rather consider the instructions as a whole to determine if they fairly and adequately

2   reflect the law applicable to the case.").

3       A defendant may also move for a new trial based on the weight of the evidence.  Even where

4   there exists sufficient evidence to support the verdict, a district court may nonetheless grant a motion

5   for new trial if it "'concludes that . . . the evidence preponderates sufficiently heavily against the

6   verdict that a serious miscarriage of justice may have occurred.'"  *Kellington*, 217 F.3d at 1087

7   (quoting *Alston*, 974 F.2d at 1211); *see also United States v. Martinez*, 763 F.2d 1297, 1312-13

8   (11th Cir. 1985) (recognizing that the district court may not "set aside the verdict simply because it

9   feels some other result would be more reasonable.  The evidence must preponderate heavily against

10  the verdict, such that it would be a miscarriage of justice to let the verdict stand." (citation omitted)).

11  While not as rigorous as the showing needed to satisfy Rule 29, it is a demanding standard

12  nonetheless, and the Ninth Circuit has held that such motions are generally disfavored and should

13  only be granted in "exceptional" cases.  *See United States v. Del Toro-Barboza*, 673 1136, 1153 (9th

14  Cir. 2012); *see also United States v. Camacho*, 555 F.3d 695, 705 (8th Cir. 2009) ("New trial

15  motions based on the weight of the evidence are generally disfavored . . . .").

16  B.   <u>Defendant Is Not Entitled to a New Trial Based on the Sufficiency of the Evidence</u>

17      Defendant contends that a new trial is warranted in this case because the verdict is contrary

18  to the weight of evidence.  In making this argument, Defendant forcefully recounts the evidence that

19  was adduced at trial in support of the Defendant and the inferences defense counsel attempted to

20  draw from this evidence in support of his claim he had no intent to embezzle.  At the same time, as

21  noted above, there is significant evidence in the record in support of the verdict, evidence which

22  strongly suggests Defendant possessed an intent to take the instruments for his own use.  That a

23  different jury, presented with the same facts, could have determined that Defendant lacked the intent

24  to commit the offenses for which he is charged, "is not enough to warrant a new trial."  *United

25  States v. McGee*, No. CR-12-0052 EMC, 2013 WL 2645211, at *4 (N.D. Cal. June 12, 2013).

26      Further, Defendant's reliance on *Kellington* and *Alston* are unavailing.  In both cases, the

27  Ninth Circuit was called upon to review a district court's *grant* of a new trial motion.  Both Courts

28  noted the extremely deferential standard of review the Ninth Circuit applies to review of new trial

**United States District Court**

For the Northern District of California

1  motions.  *See Kellington*, 217 F.3d at 1097 ("'*Our role is limited to determining whether the district*

2  *court 'clear[ly] and manifest[ly] abused its discretion.*'" (quoting *Alston*, 974 F.2d at 1211-12)

3  (emphasis and alterations in original)).  They noted that this deference made sense because "Circuit

4  judges, reading the dry pages of the record, do not experience the tenor of the testimony at trial.  the

5  balance of proof is often close and may hinge on personal evaluations of the witness demeanor."  *Id.*

6  (quoting *Alston*, 974 F.2d at 1211).  Thus, while the district court in *Kellington*, on the facts of that

7  case, found the fact that there was "no direct evidence of [defendant's] mental state" was significant

8  in granting a new trial, the Ninth Circuit's determination that this was not an abuse of discretion

9  does not aid Defendant.

10      The Court has had the opportunity to hear the evidence and observe the testimony –

11  including the testimony and demeanor of Defendant himself.  On the basis of its observations and its

12  view of the evidence, the Court cannot conclude that the "evidence preponderates sufficiently

13  heavily against the verdict" such that a "serious miscarriage of justice may have occurred."

14  *Kellington*, 217 F.3d at 1087.  Accordingly, Defendant's motion for a new trial based on sufficiency

15  of the evidence is **DENIED**.

16  C.    <u>The Government's Summary Witness Did Not Violate Defendant's Right to Cross</u>

17          <u>Examination and the Right to Confront Witnesses</u>

18      Defendant argues that the testimony of FBI Special Agent Douglas R. W. Cook violated his

19  rights to cross examine and confront witnesses.  Defendant contends that the government employed

20  Agent Cook's testimony as a vehicle for introducing the testimony of witnesses the government

21  chose not to call at trial.  Docket No. 259, at 24.  Specifically, he argues that the government used

22  Agent Cook to improperly "rehabilitate" prior testimony that the Panoramic system was reliable and

23  accurately reflected all transactions relating to an estate.  *Id.*  He alleges Agent Cook did this by

24  serving as a conduit for out-of-court declarants.

25      The government proffered Agent Cook as a "summary" witness.  Docket No. 159. at 3.

26  Courts have noted that a "summary witness can help the jury organize and evaluate evidence which

27  is factually complex and fragmentally revealed in the testimony of a multitude of witnesses

28  throughout the trial."  *United States v. Lemire*, 720 F.2d 1327, 1348 (D.C. Cir. 1983).  The Ninth

United States District Court
For the Northern District of California

1   Circuit has noted the danger of admitting summary witness testimonies who "summarize evidence,

2   including oral testimony, previously admitted in the same trial," – specifically the risk that the

3   credibility of summary witnesses will be substituted for the credibility of the evidence actually

4   summarized. *United States v. Leon-Reyes*, 177 F.3d 816, 819 n.4 (9th Cir. 1999).

5        The Court has reviewed the portions of Agent Cook's testimony Defendant claims

6   constituted an improper "rehabilitation" of San Mateo County's Panoramic system.  First, Defendant

7   points to the following exchange:

8        Q.      What is a transaction ledger for an estate in Panoramic?

9        A.      Simply, it shows the money coming in for the benefit of, or out
         of an estate.  Basically, the income and expenses associated with the
10       administration of an estate.

11  Cook Tr. at 15:5-8.  Further, Defendant notes that Agent Cook was able to testify that records of

12  various estate assets were not located in Panoramic's transaction ledgers.  For example, regarding

13  the Rickey Bates estate and cashier's check:

14       A.      . . . This is San Mateo County Public Administrator Client
         Transaction Ledger for the Rickey Bates estate.
15
         Q.      Money in, money out, and balance for the Bates estate?
16
         A.      Correct
17
         Q.      From the Panoramic database?
18
         A.      Correct.
19
         Q.      Have you reviewed this transaction ledger?
20
         A.      I have
21
         Q.      Is the $5,613 that Wong obtained from the sale of Bates
22       jewelry reflected anywhere on this transaction ledger?

23       A.      No.

24       Q.      Have you reviewed the public administrator's office paper file
         for the Bates estate?
25
         A.      I have.
26
         Q.      Is there any documentation in that paper file about the sale of
27       the Bates jewelry to Carole Richbourg?

28       A.      No.

United States District Court
For the Northern District of California

*Id.* at 64:16 - 65:7.  Finally, on cross examination, *counsel for Defendant* elicited the following from Agent Cook:

> Q.    And you testified that those watches were not, according to your investigation, recorded in the inventory of the Panoramic database.  Is that correct?
>
> A.    That's correct.  I was unable to locate them in the Panoramic database.
>
> Q.    All right.  And based upon your failure to find those items in Panoramic, you concluded that – or you believed that Mr. Wong was hiding those assets; is that your conclusion?
>
> A.    I was unable to locate it in, basically, the San Mateo County public records; however, they still were bearing item numbers consistent with how they would inventory them for an estate.  But because I was unable to locate them in county records, I believe, based on my training and experience, that somehow the records related to them were removed.

*Id.* at 121:25 - 122:13.  The problem, according to Defendant, is that Agent Cook had no expertise in Panoramic but rather his information regarding the database came from interviews with County employees – some of whom did not testify at trial.

The Court finds that admission of Agent Cook's testimony was not erroneous.  On direct examination, Agent Cook simply testified as to his investigation.  Specifically, he testified that he had searched the estate paper files and Panoramic inventory records and found no reference to certain items or negotiable instruments – testimony based on his personal knowledge.  While Agent Cook's opinion that he believed "based on [his] training and experience" that the records related to those items had been removed, *Defendant* elicited this testimony on cross examination.  The Court has reviewed the entirety of Agent Cook's direct examination and did not locate any instance where Agent Cook opined on or vouched for the reliability (or lack thereof) of the Panoramic system.  Moreover, under the invited error doctrine, defendants will not heard to complain about their own evidentiary errors.  *See United States v. Reyes-Alvarado*, 963 F.2d 1184, 1187 (9th Cir. 1992).  In *United States v. Miller*, 771 F.2d 1219 (9th Cir. 1985), defendant argued on appeal that the district court erred in permitting a witness to introduce compound hearsay.  The Ninth Circuit rejected this argument, finding that "[t]he testimony to which appellants object was elicited on cross-examination by counsel for the Leeses . . . .  Appellants may not seek reversal on the basis of their own

**United States District Court**
For the Northern District of California

evidentiary errors." *Id.* at 1234; *see also United States v. Neal*, 78 F.3d 901, 904 (4th Cir. 1996) (applying invited error doctrine where most challenged statements were "elicited by [defendant's] own attorney from a government witness during cross-examination").

The primary case upon which Defendant relies – *United States v. Freeman*, 498 F.3d 893 (9th Cir. 2007) – is inapposite.  In that case, the Ninth Circuit addressed the problems that can arise when a government witness serves dual roles as both case agent and expert (for example by interpreting code words in a drug action as well as describing his investigation).  *Id.* at 902.  The Court noted that by qualifying as an expert, the witness "attains unmerited credibility when testifying about factual matters from first-hand knowledge." *Id.* at 903 (citation omitted)  Further, it recognized that having a witness serve these two roles, there is a risk that cross examination will be inhibited and an increased danger that the "expert testimony will stray from applying reliable methodology and convey to the jury the witness's sweeping conclusions about appellants' activities." *Id.* (citation and internal quotation marks omitted).

Here, Agent Cook did not testify as an expert.  To be sure, Agent Cook testified to certain matters based on his "training and expertise."  However, the matters on which he so testified on direct examination were narrow: (1) stating that in his "training and experience" that the abbreviation "¶" means "personal property" and "INC" means "including money" (Cook Tr. at 26); (2) stating based on his "training and experience" that "Y/M" means "yellow metal" (*id.* at 83); (3) stating based on his "training and experience" that "W/M" means "white metal" (*id.* at 84); (4) stating based on his "training and experience" that WD means "withdrawal" (*id.* at 87).  Even were the Court to conclude that this testimony constituted impermissible expert testimony, the scope of this testimony was narrow and did not, contrary to Defendant's argument, touch on the reliability of Panoramic.

Accordingly, the Court finds that admission of Agent Cook's testimony as a summary witness did not violate Defendant's right to cross examine or otherwise confront witnesses. Accordingly, Defendant's motion for a new trial on this ground is **DENIED**.

**United States District Court**
For the Northern District of California

D.   <u>Failure to Instruct the Jury on the "Mistake of Fact" Defense Does Not Warrant a New Trial</u>

In the final jury instructions, the Court gave the following instruction regarding Defendant's "mistake of fact" defense:

**JURY INSTRUCTION NO. 43**
**MISTAKE OF FACT**

As to Count Two, the Defendants have raised as a defense that their belief that they were authorized to engage in the actions underlying the charged offense as to that count, even if shown to be mistaken, shows that they did not have the knowledge or intent required to be guilty of the offense charged in that count.

It is the government's burden to prove beyond a reasonable doubt that Defendants had the knowledge or intent required for the offenses charged in the indictment. If, after considering all the evidence in this case, you have a reasonable doubt about whether Defendant Yagi or Defendant Wong had the knowledge or intent required for the offense charged in Count Two, either because you find that he or she had an honest belief that all their actions were authorized or for any other reason, you must find that Defendant not guilty of that offense.

Docket No. 232. Defendant argues that the Court erred by failing to instruct the jury that Defendant's "mistake of fact" defense applied to Counts Three, Four, and Six. The Court disagrees.

Before and during the trial, Defendant asserted a "mistake of fact" defense based on Defendant's argument that he had an honest, even if mistaken, belief that his actions (such as taking estate property home and the like) were authorized. *See* Docket No. 102, at 7 (Defendant's proposed mistake of fact instruction stating that if "defendant's conduct would have been lawful under the facts as he believed them to be, he/she did not commit the charged offense"); Docket No. 182 (Defendant stating the "evidence will show that, even if defendants did not have authority to act as they did, they at least believed that they acted with authority").

As the Court has previously noted in ruling on the jury instructions (Docket No. 230), a mistake of fact defense holds that where a defendant holds a mistaken belief which "negate[s] the mental state necessary for conviction of the offense with which he or she has been charged, the crime simply has not been committed." *United States v. Iron Eyes*, 367 F.3d 781, 784 (8th Cir. 2004). As to Count Two, Defendant had established a sufficient factual basis for a mistake of fact

1    instruction under this standard.  Count Two involved a $5,000 payment Mandy Yagi gave to

2    Defendant and his partner from the Gerstein estate.  The evidence at trial from Ms. Yagi and

3    Defendant was that this payment was in compensation for Defendant and his partner adopting the

4    late Ms. Gerstein's dog.  Both Ms. Yagi and Defendant testified that such payments were standard

5    practice to compensate individuals for adopting a decedent's pet.  The Court found that if

6    Defendants had honestly, but mistakenly, believed that payments of this kind were authorized by the

7    polices and practices of the County, they could not, by definition, have had the specific intent to

8    steal, convert, embezzle, or misappropriate the funds in question.

9           The alleged "mistakes of fact" as to the other counts, however, are of a different nature.  At

10   the hearing on the instant motion, Defendant argued that there were two relevant "mistakes" – (1)

11   That Defendant mistakenly believed he was authorized to do things such as bringing estate property

12   home, temporarily placing estate funds in his personal account, etc., and (2) that he mistakenly

13   believed he could not have deposited or redeemed the cashier's checks or savings bond at issue.  The

14   problem with Defendant's "mistake of fact" theory is that neither mistake would necessarily have

15   negated the intent for the crime.  To be sure, both mistakes, if believed, might have probative value

16   on the question of intent.  That is, if the jury believed Defendant's testimony that he did not think he

17   could cash the checks or that he was authorized to keep the property at home, this would tend to

18   support the conclusion that Defendant did not have the ultimate intent to steal.  Neither "mistaken

19   belief," however, necessarily negates the ultimate intent for the crime.  Thus, as the Court noted in

20   its prior order rejecting Defendant's broader mistake of fact instruction:

21              estate items in Defendants' home and the placing of estate funds in
                personal accounts are probative circumstantial evidence of the
22              Defendants' intent to, for example, steal or embezzle.  In this way, any
                mistake Defendants may have had regarding their authority to do these
23              things provide innocent explanations and are thus probative of the fact
                that Defendants may not have had the requisite mental state.  But the
24              mistake does not necessarily *negate* the required mental state.
                Defendants could mistakenly believe they were authorized to have
25              estate property in their home or deposit funds in their personal account
                and still intend to steal the property.  This is simply not a case where
26              the mistake directly negates the required intent, such as where a
                person lacks the specific intent to steal another person's umbrella
27              because he mistakenly believes it to be his.

28   Docket No. 230, at 60-61.

**United States District Court**
For the Northern District of California

Further, the Court finds that the instructions as a whole were not misleading.  First, the instructions accurately conveyed that the government had the burden to prove *every* element of "theft concerning a program receiving federal funds" beyond a reasonable doubt.  *See* Docket No. 232, at 34.  Second, Instruction 34 made clear that one of these elements was that "defendants stole, embezzled, obtained by fraud, knowingly converted, or, as to Count Two, intentionally misapplied property."  *Id.* at 38.  Instruction 34 carefully defined the mens rea requirement for each of these theories.  Specifically, it provided:

> To steal money or property means to take someone else's money or property without the owner's consent **with the intent to deprive the owner of the value of that money or property**.

> To embezzle money or property **means to wrongfully, intentionally take or convert to one's own use money or property of another** after that money or property lawfully came into the possession of the person taking it by virtue of some office, employment, or position of trust.

> To obtain by fraud means to act **knowingly and with intent to deceive or cheat**, usually for the purpose of causing financial loss to someone else or bringing about a financial gain to oneself or another.

> To knowingly convert money or property means to **knowingly appropriate** or use such money or property without proper authority for the benefit of oneself or any other person who was not the rightful owner **with the intent to deprive the rightful owner of the money or property**.

*Id.* at 38 (emphases added).  Accordingly, the instructions, taken as a whole, make clear that the jury could not have convicted Defendant without finding that he had the *intent* to steal, embezzle, deceive, or deprive a rightful owner of money or property.  The jury was free to find that because of a mistaken belief, Defendant did not possess the requisite intent.  It did not.  Accordingly, Defendant is not entitled to a new trial on the basis of the alleged instructional error.  *Cf. United States v. Shipsey*, 363 F.3d 962 (9th Cir. 2004) ("Our case law is well settled that a criminal defendant has 'no right' to *any* good faith instruction when the jury has been adequately instructed with regard to the intent required to be found guilty of the crime charged, notwithstanding the normal rules governing 'theory of defense' requests."); *see also United States v. Dominguez*, 661 F.3d 1051, 1072 (11th Cir. 2011) (finding where instructions on mens rea were correct statement of law it was not an

United States District Court

For the Northern District of California

1   abuse of discretion to refuse "to give a separate instruction on specific intent and mistake of fact");

2   *United States v. Chinasa*, 789 F. Supp. 2d 691, 698 (E.D. Va. 2011) ("[T]he Court instructed the

3   jury on intent . . . . Thus, the Defendant's proposed mistake of fact instruction was not necessary to

4   correct any failure of the court to instruct the jury on intent or materiality.").

5   E.   <u>Reconsideration of the Court's Motion to Suppress Ruling Is Not Warranted</u>

6        On December 19, 2012, Defendant filed a motion to suppress all evidence obtained by the

7   San Mateo County Sheriff's search of his home. Docket No. 52. Defendant's motion was based on

8   three arguments. First, Defendant argued that the affidavit in support of the search warrant failed to

9   establish probable cause as there were no facts supporting the belief that property was missing from

10   estates, that defendants had been seen taking property from an estate, or the like. *Id.* at 9. Second,

11   Defendant argued that the affidavit in support of the search warrant did not establish a nexus

12   between the suspected criminal activity and Defendant's home. Finally, Defendant claimed that the

13   "suspicious activity" referenced in the search warrant was stale because the Defendant had quit his

14   job with the County (thus terminating the suspicious activity) a month before the warrant issued.

15        On February 8, 2013, the Court denied Defendant's motion to suppress.[4] Docket No. 70.

16   Defendant now contends, however, that "trial testimony revealed facts that, had they been known at

17   the time of the motion to suppress, could have tipped the balance in favor of granting the motion."

18   Docket No. 259, at 29. Defendant points to two lines of testimony from the trial in support of this

19   argument. First, Defendant contends that it was "revealed" that Ms. Yagi had "contacted Aging and

20   Adult Services and informed them that she had estate property in her home that she wanted to

21   return." *Id.* He further contends that the fact that Detective Lopez of the San Mateo County

22   Sheriff's office sought the search warrant within 2.5 hours of this call shows that Detective Lopez

23   was aware of the call and yet did not disclose it to the magistrate. *Id.* Accordingly, Defendant

24   contends that if the magistrate had been informed that "Ms. Yagi intended to return any estate

25   property that was in her possession," it may have convinced the magistrate that no crime had

26   actually occurred and could have led to a denial of the warrant. *Id.* at 30.

27

28        [4] The Court denied the motion to suppress in a minute order which stated the denial was "[f]or the reasons stated on the record." Docket No. 70.

United States District Court

For the Northern District of California

1    Second, Defendant contends that the San Mateo County Sheriff's search warrant attempted

2    to establish nexus between the suspected criminal activity and Mr. Wong's house by stating that

3    "evidence of criminal conduct would be found on computers and other electronic device[s] that

4    would be in the home." *Id.*  However, Defendant argues that trial testimony shows that having

5    seized Defendant's computers, no government official ever searched them.[5]  Thus, Defendant argues

6    this reveals that the statements in the search warrant application regarding there being a "high

7    likelihood" of evidence being found on Defendant's computers were a mere "ruse to gain entry" into

8    Defendant's home. *Id.*

9    The purpose of a motion to reconsideration is to "'correct manifest errors of law or fact or to

10   present newly discovered evidence.'" *Ausano v. Safeway Stores, Inc.*, No. C91-2522-DLJ, 1994 WL

11   225064 (N.D. Cal. Apr. 28, 1994) (quoting *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir.

12   1985)).  "'To succeed, a party must set forth facts or law of a strongly convincing nature to induce

13   the court to reverse its prior decision.'"  *United States v. Lieng*, No. CR F07-316 LJO, 2012 WL

14   1481518, at *1 (E.D. Cal. Apr. 27, 2012) (quoting *United States v. Westlands Water Dist.*, 134 F.

15   Supp. 2d 1111, 1131 (E.D. Cal. 2001)).  Defendant has not met his burden to establish that

16   reconsideration is warranted.  Defendant's arguments are based on speculation and disputed

17   testimony.  For example, Ms. Yagi's testimony that she contacted Aging and Adult Services and

18   informed them she had estate property she wanted to return was squarely controverted at trial and

19   the argument that the San Mateo County Sheriff's Office was aware of this purported call is pure

20   speculation.  The fact that the Sheriff's Office did not search Defendant's computers does not negate

21   the probable cause they had to obtain the warrant in the first place.

22   On the record presented by Defendant, the Court finds that Defendant has not set forth facts

23   or law "of a strongly convincing nature" to induce the Court to revisit its suppression ruling.

24

25   ─────────────────

26   [5] Defendant has not provided any citation to transcripts which would allow the Court to
     review this evidence or testimony.  It is not the Court's obligation to scour the record searching for
     testimony in support of Defendant's arguments. *Cf. United States v. Allen*, No. 06-10170-RCL,
27   2007 WL 1412563, at *3 (D. Mass. May 10, 2007) ("I was under no obligation to search the court's
     records . . . .  In other words . . . I was not required to 'ferret out an evanescent needle from an
28   outsized haystack.'" (quoting *Rivera-Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1988)).

1   Accordingly, Defendant's motion to have this Court reconsider its prior motion to suppress ruling

2   and to grant a new trial on this basis is **DENIED**.

3                              **VI.    CONCLUSION**

4         For the foregoing reasons, Defendant's motions for acquittal pursuant to Fed. R. Crim. P. 29

5   and for a new trial pursuant to Fed. R. Crim. P. 33 are **DENIED**.

6         This order disposes of Docket No. 257, 258.

7

8         IT IS SO ORDERED.

9

10   Dated:  March 5, 2014

11                                                    _____

12                                                    EDWARD M. CHEN
                                                     United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

23